# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CHARLES GILLIAM,                                    Case No. 1:18-cv-700

    Plaintiff,                                    Cole, J.
                                                    Bowman, M.J.

       v.

NORFOLK SOUTHERN RAILWAY COMPANY,

    Defendant.

## REPORT AND RECOMENDATION

Plaintiff Charles Gilliam filed suit in October 2018 under the Federal Employers'
Liability Act ("FELA") against his employer, the Norfolk Southern Railway Company
("NSRC"). Defendant has moved for partial summary judgment, as well as to strike an
affidavit filed by Plaintiff in opposition to summary judgment. (Docs. 21, 27). This case
has been referred to the undersigned for a recommended disposition of the pending
motions. (Doc. 2). For the following reasons, both motions should be granted.

## I.  Summary Judgment Standard

In a motion for summary judgment, "a court must view the facts and any inferences
that can be drawn from those facts ... in the light most favorable to the nonmoving party."
*Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal
quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P.
56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility

determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.* The parties agree on most facts; where disagreement exists, the undersigned has drawn all reasonable inferences in favor of the Plaintiff.

## II.    Findings of Fact

Plaintiff alleges injuries from two separate workplace accidents.  Defendant's motion for summary judgment concerns only the more recent accident, which occurred when Plaintiff slipped on a step while exiting a locomotive on which he had been assigned to work.  Thus, only facts relevant to the March 8, 2018 incident are summarized in this Report and Recommendation ("R&R").

Plaintiff worked exclusively at the Portsmouth Yard.  The Portsmouth Yard contains three yard areas with multiple tracks, two connected areas known as the "East Yard and the West Yard," and a third "shop yard" near the service building where repairs and servicing are conducted.  (Doc. 18, Plaintiff's Depo. at 25, PageID 124; *id.* at 102, PageID 201).  Plaintiff was working as an engineer in the "UP03" job.  In that position, Plaintiff used a locomotive to move rail cars around the car shop and its adjacent yard so that others could make repairs.  (*Id.*, at 104, PageID 203).  To make room for incoming cars, Plaintiff also would move the rail cars on which service had been completed.  (*Id.* at 105, PageID 204).  As opposed to an engineering position more directly involved in interstate commerce, the UP03 job was limited to moving cars into and out of the service building and - once service was completed - to the East Yard where other transportation workers would move them further to assemble outbound trains.  (*Id.*)

In the days leading up to March 8, the weather had been "clear and cold" but dry. (*Id.* at 106, PageID 205).  There was no snow in the forecast, nor was there snow on the ground.  (*Id.*; *see also id.* at 110, PageID 209).  Little snow had fallen all winter.  (*See id.*, testimony that it had snowed "[m]aybe one time, maybe an inch I think it was all year that year.")  However, on that day a brief but intense snow squall began around 10:30 a.m. The unexpected snow "came out of the blue," surprising everyone.  (*Id.* at 106, PageID 205).  During the squall, the snow fell heavily, "like a white out." (*Id.* at 109, PageID 208). The storm lasted no more than 10 to 15 minutes but approximately a half inch of snow covered the ground by its end.  (*Id.* at 122, PageID 121; *id.* at 184, PageID 283 (estimating that storm altogether lasted "[p]robably ten minutes.").

When the storm arose, Plaintiff was working in the cab of a locomotive identified as NS 3058.  (*Id.* at 117, PageID 216).  When he reported to work, he performed a 20-minute daily inspection on NS 3058.  (*Id.* at 117-119, PageID 216-218).  The inspection included the exterior steps and walkway where he later fell; he saw no slip or trip hazard at that time.  (*Id.* at 119, PageID 218).

Within "a couple of minutes" of the storm's onset, Plaintiff's conductor, Ralph Boggs, ordered Plaintiff to leave the NS 3058 cab due to poor visibility.  (*Id.* at 115). Specifically, Plaintiff was instructed to shove cars in the clear on the shop lead and to "tie it" down (setting a brake on NS 3058) before going inside the service building for a job briefing and break, and to secure winter boots.  At the time, the locomotive was parked across from the service building, approximately 25 yards away.

Plaintiff "never used" snow boots because "[w]e didn't get any snow." (*Id.* at 111, PageID 210).  When he exited the cab wearing regular work boots, it had only been snowing a "couple of minutes" or "probably three minutes, [or] four." (*Id.* at 109, PageID 208; *id.* at 122, PageID 221).  Plaintiff observed that the ground was "probably just covered." (Doc. 18 at 122, PageID 221).  He stepped out a side door of the cab to a platform where he could see a thin coating of light snow.  (*Id.* at 128, PageID 227).  Attached to the platform were three steps, from which Plaintiff believed he could safely descend to the ground.  (*Id.* at 129-136, Page ID 228-235).  He placed both hands on the grab irons as he began his descent, but his left foot slipped on the second step.  He lost his grip with his right hand and the wrenching motion caused an injury to his shoulder. Plaintiff has not been able to return to work.

There is no evidence that there was anything other than snow on the step.  When asked whether it was "just snow," Plaintiff speculated that some ice might have been "mixed in" but had no knowledge that was the case.  He testified he saw only snow, and did not observe ice or anything else that had accumulated in the 3 or 4 minutes of snowfall prior to his accident:

> It could have been ice with that [snow].  I don't know what it was.  It was a bad storm.  I don't know what was in it.  You mean mixed in with the snow?  It *could* have been ice.  *I don't know.*
>
> Q:  In order for it to be ice, it would have had to thaw and refreeze, wouldn't it?
>
> A:  *I don't know.*  It was bad weather.  *I'm not a weatherman.*
>
> …
>
> A:  *All I saw was snow.*

(*Id.* at 146, PageID 245 emphasis added).

In hindsight, Plaintiff opined that the conductor should have instructed him to stay inside the cab rather than exiting, and that someone should have brought snow boots out to him from the service building rather than asking him to take a break to retrieve them. However, Plaintiff did not question his conductor's order at the time, even though he would not have followed the order if it was unsafe.  Plaintiff "didn't think it was dangerous or I wouldn't have did it."  (*Id.* at 129, PageID 228; *see also id.* at 130, PageID 229 "I didn't think it was unsafe" or that "anything would go wrong.").

### III.     Preliminary Issue Concerning Plaintiff's Expert's Opinion

Prior to turning to the merits of the pending motion for partial summary judgment, the undersigned must address Defendant's motion to strike the affidavit of Patrick F. Reilly and attachments thereto, which have been filed by Plaintiff as exhibits in opposition to Defendant's dispositive motion.  For the reasons stated in Defendant's memoranda in support of the motion to strike, the undersigned agrees that the Reilly affidavit should not be considered.  Expert opinion will not assist the trier of fact in understanding any factual issue, and instead addresses issues of law that are reserved to this Court.  The undersigned therefore has not considered the affidavit on summary judgment, but declines to strike it in order to preserve the record for any reviewing court. *See Clausing v. Norfolk So. Ry. Co.*, Case No. 1:16-cv-703 (Doc. 28, Opinion & Order filed 9/30/20 at PageID 574, striking similar affidavit because the opinions were "clearly legal opinions directly bearing on whether the LIA and the federal regulations at issue in this case have been violated.").

## IV.    Analysis of Defendant's Partial Summary Judgment Motion

Plaintiff seeks to hold Defendant liable for his injuries under FELA, which requires rail carriers to provide rail workers a safe place to work.  There are two ways for Plaintiff to recover under FELA: (1) by proving the elements of simple negligence; or (2) by showing that the Defendant violated a specific statutory or regulatory duty, which constitutes negligence per se.

> If a plaintiff proves a railroad violated a statutory duty, then the plaintiff need not prove the common law elements of foreseeability, duty, or breach. *Edwards v. CSX Transp. Inc.*, 821 F.3d 758, 760 (6th Cir. 2016). Moreover, a violation of a safety statute "creates liability under FELA ...without regard to whether the injury flowing from the breach was the injury the statute sought to prevent." *Kernan*, 355 U.S. at 433, 78 S.Ct. 394. Thus, "a railroad's violation of a safety statute ... is negligence per se." *McBride*, 564 U.S. at 703 n.12, 131 S.Ct. 2630.

*Miller v. Union Pacific R. Co.*, 972 F.3d 979, 984 (8th Cir. 2020).

The issues presented have been thoroughly briefed by both parties, including not only the usual memoranda in support, in opposition, and in reply, but also supplemental memoranda and Notices of authority.  (*See* Docs. 21-26, 29, 34-40, 42-45).  Based upon the extensive briefing and the Court's review of the issues presented, the undersigned will deny Plaintiff's request for oral argument as unnecessary to aid the Court.[1]

## A. Plaintiff Cannot Prove Simple Negligence

Under the "relaxed" negligence standard that applies under FELA, "an employee must prove *only* that the railroad's negligence played *a* part in producing the injury for which the employee seeks damages." *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 597

---

[1]Ordinarily, the undersigned attempts to liberally accommodate all requests for oral argument, with particular consideration afforded to counsel (such as Plaintiff's counsel here) who have been more recently admitted to the bar.  The undersigned regrets that this practice has been negatively impacted by the national pandemic at this time.

(6th Cir. 2013) (emphasis original). The duty to provide a "reasonably safe workplace…does not mean that a railroad has the duty to eliminate all workplace dangers, but only the duty of exercising reasonable care to that end." *Williams v. Grand Trunk Western R.R., Inc.*, 352 Fed. Appx. 13, 16 (6th Cir. 2009) (holding that rail carrier could not be held liable for failure to remove snow from equipment or track, internal quotation marks and additional citation omitted). Here, Plaintiff cannot identify any *unreasonable* risk to which he was subjected.

"[T]he Sixth Circuit has held: '[A] railroad's failure to cure specific dangerous conditions, including failures to remedy conditions created by winter weather, may constitute negligence.'" *Tipton v. Norfolk Southern Ry. Co.*, 2010 WL 2927186, at *3 (N.D. Ohio 2010) (quoting *Williams,* 352 Fed. Appx. at 17). However, the operative word is "may": a railroad is not liable for an accident that occurs under severe weather unless a plaintiff shows that the defendant "should or could have [] known" of the risk, and had the "opportunity to correct it." *Id.* (quoting *Miller v. Cincinnati, N.O. & T. P. Ry. Co.*, 317 F.2d 693, 695 (6th Cir. 1963)). As a case cited by Plaintiff explains:

> The FELA does not assign liability based solely on "the existence of transient conditions created by the weather...." *Borum v. Grand Trunk W. R.R., Inc.,* 659 F.Supp.2d 853, 857 (E.D. Mich. 2009) …. If, however,
>
>> snowfall is considerable in quantity and allowed to remain for extended periods of time, the employer would be required to exercise a reasonable degree of care to prevent an accumulation of snow or ice in such quantity and location as would constitute a menace to the safety of the employees in the performance of their various duties. The degree of care required by such employer must have some reasonable relationship to the ability of that party upon whom the duty is cast to perform such duty.

*Keller v. Norfolk Southern Ry. Co.*, 2013 WL 322176, at **2-3 (N.D. Ohio 2013) (additional internal citations and citations omitted).

7

Here, the weather that created the alleged slippery condition was completely unforeseen and had been ongoing for mere minutes prior to Plaintiff's accident. Plaintiff might be able to demonstrate that Defendant subjected him to an "unreasonable" risk if it had been snowing for some time. But unlike the cases on which Plaintiff relies, Defendant did not ignore the accumulation of snow or ice for hours, or fail to react to the inclement weather. Instead, Boggs called for a break as soon as the squall arose. Plaintiff's locomotive was parked directly across from the service station. By the time Plaintiff exited the cab and slipped, only a "relatively thin coating" of snow that "[j]ust covered" the ground was visible and no more than "three or four minutes" had elapsed. (Doc. 18 at 128, PageID 227; *id.* at 122, 109, PageID 221, 208).

Working (and walking) in a rail yard necessarily involves some risk. Even considering its liberal purpose and relaxed standard of negligence, liability under FELA attaches only when a risk of which a defendant knew or should have known is deemed "unreasonable." Most cases involving inclement winter weather arise when a defendant has failed to move snow from driveways or from concrete work areas. *Williams*, 352 Fed. Appx. at 16 (collecting cases). Because there was no snow in the forecast and Plaintiff's supervisor acted so swiftly in calling for a work stoppage to retrieve nearby snow gear, Defendant cannot be held liable for creating an unreasonable risk. Otherwise, FELA would impose liability for any slip or fall during any type of precipitation, a standard that the Supreme Court has rejected as inconsistent with Congressional intent. *See Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543, 114 S.Ct. 2396 (1994) ("The FELA 'does not make the employer the insurer of the safety of his employees while they are on duty. The basis of ...liability is his negligence, not the fact that injuries occur.'")

8

(internal citation omitted). In other words, "[t]hat FELA is to be liberally construed… does not mean that it is a workers' compensation statute." *Id.*

Plaintiff protests that a question of fact remains, asserting that it would have been safer for Plaintiff to remain where he was in the locomotive cab until Boggs or someone else could bring Plaintiff a pair of snow boots. (*See* Doc. 25 at 19, arguing that "at the time of injury Plaintiff was safely positioned in a locomotive during a break period."). Plaintiff asserts that Defendant seeks "a free pass to expose Plaintiff to clearly unsafe conditions" based on weather. (Doc. 25 at 18). However, the mere fact that Plaintiff can conceive of a way in which to reduce hypothetical risk (by taking Plaintiff a pair of snow boots before he exited) does not mean that the risk to which he was subjected by leaving the cab was "unreasonable" as a matter of law.[2]

> "'[T]he proper inquiry is whether the method prescribed by the employer was reasonably safe, not whether the employer could have employed a safer alternative method for performing the task.'" *Johnson v. Grand Trunk Western R.R.,* 2008 WL 283703, *4 (E.D. Mich. Jan. 31, 2008) citation omitted); *See also Detroit T. & I.R. Co. v. Banning*, 173 F.3d 752, 755 (6th Cir.1949) (finding district court erred in submitting to jury the issue whether railroad was negligent because a "temporary dangerous working condition" resulting from weather does not constitute negligence if "reasonable steps are taken or means provided by the carrier to counteract or avoid the danger ...").

*Borum v. Grand Trunk Western R.R., Inc.*, 659 F.Supp.2d 853, 857-58 (E.D. Mich. 2009).

Defendant cannot have been expected to foresee that dismounting the cab to traverse the short distance to retrieve snow boots within three to four minutes of the onset

---

[2] Any reduction in risk is theoretical because it would have required additional employees to carry heavy boots while climbing up the ladder to take the boots to Plaintiff (as well as to anyone else working in the yard). Plaintiff testified that multiple people were working in the yard at the time and were instructed to stop work and come in to get their snow boots. (Doc. 18 at 155-156, PageID 254-255). It is unclear whether requiring additional personnel to go into the yard carrying snow boots would increase or decrease the risk that someone may slip or otherwise suffer injury.

of a storm would result in Plaintiff's fall.  Plaintiff testified that he had been up and down similar steps thousands of times over his 20 years of employment, including in inclement weather and including when some snow covered the steps, but had never before slipped. (Doc. 18 at 137-138, PageID 236-237).  Plaintiff observed the conditions and testified repeatedly that he would not have attempted to dismount if he thought it "unsafe."  *Accord*, *Williams*, 252 Fed. Appx. at 17 (plaintiff failed to produce evidence that anyone had observed ice and snow on the track or any dangerous condition; the only person known to have observed the track was plaintiff himself, who did not report any dangerous condition);  *contrast O'Heron v. CSX Transp., Inc.*, 181 F. Suppp.2d 779 (N.D. Ohio 2001) (summary judgment denied where defendant took no action to apply salt or otherwise abate icy conditions on walkway despite *eight hours* of freezing rain).  Based on the lack of notice or foreseeability, Defendant cannot be held liable for breaching a specific duty to Plaintiff under a simple negligence theory.

## B. The Locomotive Inspection Act

Even if he cannot prove simple negligence, a plaintiff may still recover under FELA if he can show a violation of a supplementary safety statute or regulation.  Plaintiff here argues that Defendant violated the Locomotive Inspection Act ("LIA") (formerly known as the Boiler Inspection Act ("BIA")) and three supporting regulations.  In order to state a claim under the LIA, Plaintiff must show that the locomotive was "in use" under the statute:

> A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances:
>
> (1) are in proper condition and safe to operate without unnecessary danger of personal injury;

(2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and

(3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701 (emphasis added).

Defendant argues that the LIA does not apply because the locomotive was not "in use." In the alternative, Defendant argues that it is entitled to judgment because it did not violate the language of the statute or any applicable regulation. The undersigned rejects Defendant's first contention, but agrees with the second.

### 1. The "In Use" Element

The question of whether a locomotive is "in use" and "on its line" under the LIA is for this Court to decide. *See, e.g., McGrath v. Consolidated Rail Corp.*, 136 F.3d 838, 842 (1st Cir. 1998). If a locomotive is not "in use," an LIA claim fails as a matter of law. *Coleman v. Norfolk So. R. Co.*, 304 F. Supp.3d 648, 653 (E.D. Ky. 2018). A significant body of case law has developed concerning the meaning of "in use" under both the LIA and a collection of closely related supplemental safety statutes known as the Federal Safety Appliance Acts ("FSAA"). Because of its broader application, courts frequently cite to FSAA cases when interpreting whether a locomotive is "in use" under the LIA, as do the parties in this case. Unfortunately, the case law is far from uniform in its construction.

Importantly, the 1994 enactment of the FSAA cobbled together multiple precursor statutes, including the Coupler Act and Hand Brake Act. As their titles suggest, the precursor statutes focused on discrete safety equipment with varying "uses." Some courts accordingly have interpreted the "in use" provisions of the FSAA based upon which subparagraph (or precursor statute) is involved: whether the equipment that contributed to the injury was located on a "vehicle," or a "locomotive," or a fully assembled "train," and

11

(sometimes) based upon the job description of the injured worker.  Although not all courts have drawn the same distinctions, the undersigned finds this differentiated approach to be persuasive.  *See Underhill v. CSX Transp., Inc.*, 2006 WL 1128619, at *4 (N.D. Ind. 2006) ("[U]nder the FSAA, there are separate 'in use' inquiries depending on whether the usage of a vehicle, locomotive, or train is at issue.").

Plaintiff advocates for an "in use" definition that is equivalent to the interpretation of "in use" provisions applied to "any vehicle" under the FSAA.  *See* 49 U.S.C. §20302(a)(1) - (3).  Those provisions focus on couplers, sill steps, hand brakes, ladders, grab irons, and running boards.  In considering the safety standards for that equipment, many courts have concluded that the "use" of any "vehicle" means any operational use. Thus, a vehicle remains "in use" when it is employed in the assembly or disassembly of rail cars and trains in a rail yard or on side tracks apart from mainline tracks.  In fact, a vehicle remains in use whenever it has not been pulled out of use for repair but is instead being used in its usual and customary way on any track.  *See, e.g.*, *Marks v. Union Pacific R. Co.*, 2013 WL 5309135 at *2 (E.D. Ark. Sept. 19, 2013) ("It would be passing strange if the [FSAA] Act's required safety equipment for cars – automatic couplers, efficient hand brakes, secure sill steps, secure ladders and grab irons – was not required, after all, in a place (rail yards) where this equipment was used regularly during a time (switching) when this equipment was needed to accomplish the Act's purpose."); *White v. BNSF Ry. Co.*, 2010 WL 1186197 at *5 (W.D. Wa. March 23, 2010) ("[I]f…the FSAA's coupling provisions do not apply during switching operations, the coupling provision is rendered meaningless.").

In contrast, Defendant asks this Court to adopt the "in use" definition applied to 49 U.S.C. §20302(a)(5) of the FSAA, a provision that pertains to air brakes on a "train." Despite the identical "used on any of its railroad lines" phrase that modifies all parts of the FSAA, the Sixth Circuit and other courts have held that the air brake provision applies only to fully *assembled* trains that are "in use" on a *mainline* track, which would not include switching operations or individual cars located in side yards or on side tracks.  *See Erskine v. Consolidated Rail Corp.*, 814 F.2d 266, 270 (6th Cir. 1987) (holding air brake provision of FSAA covers only "train" movement on "mainline tracks" and therefore is inapplicable to detached locomotives involved in switching operations on a separate track).[3]  Because NS 3058 was a detached locomotive parked by itself in a side yard, was assigned to a crew involved in maintenance and repair, and was not used in commerce on the mainline track, Defendant argues that it was not "in use" at the time of Plaintiff's injury under the LIA.  *See also Trinidad v. Southern Pac. Transp. Co.*, 949 F.2d 187, 189 (5th Cir. 1991) (a "train" that had not been moved from where it was assembled and not yet released for departure into interstate commerce because inspection was not yet complete was not "in use" under the FSAA).

The undersigned finds Plaintiff's definition of "in use" to be more persuasive.  The Sixth Circuit has stated that "a locomotive is 'in use' almost any time it is not stopped for repair.*" Edwards v. CSX Transp. Inc.*, 821 F.3d at 762 (quoting *Wright v. Ark. & Mo. R.R. Co.,* 574 F.3d 612, 620-22 (8th Cir. 2009) (additional citations omitted)); *see also Aldridge v. CS Transp., Inc.*, 2007 U.S. Dist. LEXIS 97971 at *15 (S.D. Ohio Apr. 17, 2007)

---

[3]Subparagraph (a)(4) of the FSAA pertains only to the brake system of a "locomotive."  *See* 49 U.S.C. § 20302(a)(4).  Neither party has cited, and the undersigned has not located, any recent decision that interprets this subparagraph's "in use" requirement.

(suggesting that under LIA, "[t]he significant issue is … the fact that the locomotive had not been marked as defective and pulled from service."). NS 3058 was not under repair and had not been flagged or otherwise pulled from service. Rather, it was being used in the manner in which it was intended: to push or pull other rail cars to and from the service yard. *See generally, Santillanes v. Union Pacific R. Co.*, 2015 WL 1137888 at ** 4-7 (D. Idaho March 13, 2015) (discussing cases defining the use of a "locomotive" under the LIA). Other courts have found similar use to fall within the scope of the LIA. *See Hinkle v. Norfolk Southern Ry. Co.*, 2006 WL 3783521, at *3 (S.D. Ohio. Dec. 21, 2006); *Hoemmelmeyer v. CSX Transportation, Incorporated,* No. 1:04-CV-00166, 2005 WL 2124259 (S.D. Ohio Aug. 30, 2005); *Underhill v. CSX Transp., Inc.*, 2006 WL 1128619; *see also Angell v. Chesapeake and Ohio Ry. Co.*, 618 F.2d 260, 262 (4th Cir. 1980) (suggesting that BIA clearly excludes only "those injuries directly resulting from the inspection, repair, or servicing of railroad equipment located at a maintenance facility.").

Defendant attempts to distinguish *Hinkle* and *Hoemmelmeyer* on grounds that Plaintiff was not engaged in the same type of "switching operations." A switching operation often involves the transition point between "non-use" and "in-use" for trains. In *Hinkle*, for example, the plaintiff fell while using a locomotive to assemble cars into trains. *Accord Underhill v. CSX Transp., Inc.*, 2006 WL 1128619 at *5 (holding that "a plain understanding of the word 'use' suggests a [locomotive] used to assemble a train is in use, whether the train is about to leave or not."); *Hoemmelmeyer*, 2005 WL 2124259 at **4-5 (holding that the "Automatic Coupler Act" provision of the FSAA applies to switching operations). Defendant insists that because NS 3058 was not engaged in the assembly

of trains but instead was dedicated to a service area, the locomotive was not "in use."[4] Defendant maintains that a locomotive used to support service operations should be viewed differently. *See, e.g., Lyle v. Atchison, Topeka and Santa Fe Ry. Co.*, 177 F.2d 221 (7th Cir. 1949); *Tisneros v. Chicago & N.W. Ry. Co.*, 197 F.2d 466 (7th Cir. 1952). However, in the cases on which Defendant relies, the locomotives in question were actually being serviced. *See also LeDure v. Union Pacific R. Co.*, 962 F.3d 907 (7th Cir. 2020) (affirming holding that locomotive on a side track was not "in use" because it was still being "serviced" and readied for its trip). NS 3058 was not being serviced or repaired but was being actively used as fully functioning rail yard equipment.

Further undercutting Defendant's argument, "switching service" in 49 C.F.R. §229.5 includes not only "assembling cars for train movements" but also "changing the position of cars for purposes of loading, unloading, or weighing; *placing* locomotives and *cars for repair or storage; or moving rail equipment in connection with work service that does not constitute a train movement.*" (emphasis added); *see also* 49 C.F.R. § 220.5. There is no rational basis for distinguishing between types of switching operations. Thus, NS 3058 was "in use" in switching yard operations to move other rail cars that required service or repair, and had not itself been pulled out of use for service or repair.

To the extent that Plaintiff's precise job duties are considered, Plaintiff remained "a member of the transportation crew, meaning not involved in the servicing or repair of the locomotive." *Chapman v. Norfolk So. Ry. Co.*, ___ F.Supp.3d ___, 2020 WL 1676915 at *5 (S.D. Ohio Apr. 6, 2020). As an engineer assigned to operate a functioning locomotive, Plaintiff's duties fell within the scope of the LIA.[5] That Plaintiff was in the

---

[4]Plaintiff testified that the UP03 job involved "switching in the yard." (Doc. 18 at 102, PageID 201).
[5]Neither party cites the court to a different definition of "transportation engineer" than that used in *Chapman*.

15

process of complying with his conductor's order to take a "break" indoors, or that NS 3058 was momentarily parked, has no bearing on whether the locomotive remained "in use." No less authority than the Supreme Court has held that a temporary pause in movement does not remove a functional car from "use." *See Brady v. Terminal R. Ass'n of St. Louis*, 303 U.S. 10, 13 (1938) (car placed on a receiving track pending the continuation of transportation after inspection, which was temporarily paused on its journey, remained "in use"). There is nothing in the statutory language of the LIA that limits its application to locomotives that remain in motion. *See also, generally, Deans v. CSX Transp. Inc.*, 152 F.3d 326, 330 (4th Cir. 1998) (locomotive that was not in storage or waiting to be moved to a repair location, but was ready for "imminent departure," remained "in use" under FSAA); *Nelson v. Grand Trunk W. R. Co.*, 2020 WL 3469175 (E.D. Mich. June 25, 2020) (concluding a train was "in use" when engineer's injury occurred during a brief stop in the middle of regularly scheduled route).

### 2. The LIA and Its Related Regulations

The LIA, like the FSAA, supplements FELA by ensuring that the rail carrier takes steps to create a safe work environment. In that vein, the LIA imposes a statutory duty upon a rail carrier to "allow" a locomotive "to be used" only if "its parts and appurtenances" "are in proper condition and safe to operate without unnecessary danger of personal injury," and "have been inspected as required," and "can withstand every test prescribed." 49 U.S.C. § 20701. The Federal Railroad Commission ("FRC") is tasked with enacting safety regulations to implement those statutory requirements. In addition to arguing that the step was not "in proper condition and safe to operate without unnecessary danger of personal injury" under the statute, Plaintiff cites three supporting regulations: 49 C.F.R.

16

§§229.45, 229.7, and 229.119.  A violation of an LIA regulation, like a violation of the statute, constitutes negligence per se under FELA.  *See Coleman*, 304 F. Supp.3d at 653.

### a. The General Duty of Safety and Maintenance Under 49 U.S.C. §20701 and 49 C.F.R. §§ 229.45 and 229.7

Plaintiff's first theory of liability is that the Defendant violated the general duty of maintenance that requires a carrier to maintain the locomotive "in proper condition and safe to operate without unnecessary danger of personal injury," in violation of 49 U.S.C. §20701 as well as 49 C.F.R. §§ 229.45 and 229.7.  The two related regulations are respectively entitled "General Condition" and "Prohibited acts and penalties."

> All systems and components on a locomotive shall be free of conditions that endanger the safety of the crew, locomotive or train.  These conditions include:  insecure attachment of components, including third rail shoes or beams, traction motors and motor gear cases, and fuel tanks; fuel, oil, water, steam, and other leaks and accumulations of oil on electrical equipment that create a personal injury hazard; improper functioning of components, including slack adjusters, pantograph operating cylinders, circuit breakers, contactors, relays, switches, and fuses; and cracks, breaks, excessive wear and other structural infirmities of components, including quill drives, axles, gears, pinions, pantograph shoes and horns, third rail beams, traction motor gear cases, and fuel tanks.

49 C.F.R. § 229.45, General Condition.

(a) Federal Rail Safety Laws (49 U.S.C. 20701–20703) make it unlawful for any carrier to use or permit to be used on its line any locomotive unless the entire locomotive and its appurtenances -

> (1) Are in proper condition and safe to operate in the service to which they are put, without unnecessary peril to life or limb; and

> (2) Have been inspected and tested as required by this part.

(b) Any person… who violates any requirement of this part or of the Federal Rail Safety Laws or causes the violation of any such requirement is subject to a civil penalty…

(c) Any person who knowingly and willfully falsifies a record or report required by this part is subject to criminal penalties under 49 U.S.C. 21311.

49 C.F.R. § 229.7, Prohibited acts and penalties.

The undersigned does not view the broad mandates in §§ 229.45 or 229.7 to impose any specific requirements beyond the general statutory requirement to keep the entire locomotive and its "parts" in "proper condition and safe to operate…without unnecessary peril" or "unnecessary danger of personal injury." [6] Other courts have similarly interpreted the referenced regulations as not expanding the LIA but "simply restat[ing] the general requirements of the LIA; railroad carriers must maintain the locomotive in a safe condition." *Coll v. BNSF Railway Company*, 2014 WL 12465426, at *5 (D.N.M. 2014) (collecting cases); s*ee also Munns v. CSX Transp., Inc.*, 579 F. Supp.2d 924, 933-34 (N.D. Ohio Sept. 27, 2008) (stating that §§ 229.45 and 229.7 impose a "broad" and "general duty to maintain its parts and appurtenances" and to not allow them to deteriorate to the point that the locomotive cannot operate safely). In context and giving the language its ordinary meaning, § 229.45 and § 229.7 do no more than emphasize that "unnecessary danger" must be avoided by proper maintenance.[7]

The same interpretation is expressed by the Guidance sections provided in the FRC's Compliance Manual. Guidance for § 229.45 explains:

> *This regulation is basically a compendium of many regulations found in the former part 230.* When this regulation was written, the railroads were concerned that the provisions of this regulation created a degree of discretion in interpretation and application by the MP&E inspectors. FRA's position is that its inspectors have always interpreted the regulations in part 230 in a reasonable manner. FRA also believes that, "conditions that

---

[6]Section 23 of the Boiler Inspection Act used the same phrase: "unnecessary peril to life or limb." See 45 U.S.C. § 23 (repealed). During the amendment of the BIA and enactment of the LIA in 1994, Congress changed the statutory phrase to "unnecessary danger of personal injury."

[7]If the phrase were "any danger" rather than "unnecessary danger," Plaintiff may have a claim. It remains within the province of Congress to provide for all-encompassing protection for rail yard workers, but that is not what FELA and its supplemental safety statutes currently provide.

endanger the safety of the crew, locomotive, or train" provide the proper and lawful limit to the application of this section.

Similarly, Guidance for § 229.7(a) explains:

Paragraph(a) of this section is the regulatory codification of the general statutory language previously contained in the Locomotive Inspection Act… This section should only be cited when defective conditions of a locomotive's appurtenances are disclosed on items not specifically covered by other provisions contained in part 229.

*MPE Compliance Manual, https://railroads.dot.gov/sites/fra.dot.gov/files/2020-05/MPEComplianceManual2013.pdf* (July 2012) (accessed on 10/23/20, emphasis added).

To the extent that § 229.45 is read as emphasizing more particular maintenance duties for the listed components, the undersigned finds no plausible reading that would expand that interpretation to prohibit *any* amount of snow that may fall upon an exterior walkway. The express terms of the regulation prohibit water for the listed components only when it is present as a "leak." In this respect, the undersigned agrees with *Coleman*:

Plaintiff's argument that naturally occurring snow, rainwater, or sleet which falls from passing clouds during inclement weather constitute "other leaks" referenced in the regulation is, at best, a strained and illogical. Nor is there case law or legislative history which supports his definition of "other leaks."

*Coleman v. Norfolk Southern Railway Company*, 304 F.Supp.3d at 655.

Because a violation of the statute constitutes negligence per se under FELA without the need to establish even the "relaxed" elements of simple negligence, courts must take care to determine that a regulatory violation has actually occurred. In a supplemental memorandum, (Doc. 42 at 3), Defendant points out that § 229.45 uses the phrase "[t]hese conditions include" before its specific list of components and non-complying conditions, rather than the phrase "include but are not limited to." Defendant

19

argues that the rule of construction known as "*ejusdem generis*" limits the scope of the regulation to the specifically listed components. (*Id.*)

Contrary to Defendant's argument, the referenced rule of construction "may not be used to defeat the obvious purpose of legislation." *Gooch v. United States*, 297 U.S. 124, 128 (1936); Other courts have held that § 229.45's list is "merely illustrative, not exclusive." *See Diede v. Burlington N.R.R. Co.*, 772 F.2d 593, 595 (9th Cir. 1985). The undersigned agrees with *Ratcliff v. Norfolk So. Ry. Co.*, Case No. 2:18-cv-715, 2020 WL 6287111 at * 6 (S.D. Ohio Oct. 27, 2020), that an exterior walkway "could fall within the purview" of § 229.45, if a rail carrier has allowed the walkway to deteriorate to an unsafe condition that constitutes unnecessary peril.[8] "Claims that railroads have breached the duty to maintain its equipment in a good and safe manner generally arise when they have allowed a locomotive, or its parts or appurtenances to deteriorate so that the locomotive cannot operate safely." *Munns*, 579 F. Supp.2d at 934.

At the same time, too broad an application of such general language threatens to supplant, rather than merely supplement, the FELA and transform it into the workers' compensation statute that the Supreme Court consistently has held it is not. And it is the FELA that remains the source of Plaintiff's claim. While the LIA and its regulations are indeed broad, they are not intended to impose liability for every slip and fall that may occur in a rail yard.

Here, § 229.45 was not violated as a matter of law because it cannot be read to prohibit the existence of snow on an exterior step within the first few minutes of a sudden squall. Unlike in *Ratcliff*, the brevity and timing of the sudden squall is undisputed and

---

[8]*Ratcliff* was decided while this R&R was being drafted. Plaintiff is to be commended for quickly bringing the decision to the undersigned's attention. (*See* Doc. 38, filed 10/28/20).

there are no genuine issues of material fact to submit to a jury. *See Ratcliff*, 2020 WL 6297111 at *6 (holding that factual issues remained under §229.45 concerning "when the snow and ice accumulated, the extent to which the snow and ice covered the walkway…, and whether Defendant had time to correct the snowy and icy conditions before Plaintiff and his fellow crew members arrived."). The step did not have excessive wear or any other structural infirmity or defect in design. It fully complied with the LIA and was in proper working order when Plaintiff inspected it at the beginning of his shift that day when the weather (and presumably the step) was dry. *Contrast Whelan v. Penn Central Co.*, 503 F.2d 886, 889 (2nd Cir. 1974) (evidence of uncorrected defects in step assembly noted on daily inspection report together with step being coated with ice for several hours was sufficient to show "unsafe" condition).

The undersigned cannot agree that the light accumulation of snow within the first minutes of an unexpected snow squall constitutes the deterioration of the step to the point of violating express statutory language of the LIA or the closely related "maintenance" language contained within 49 C.F.R. §§ 229.45 and 229.7(a). The FRC could not have intended for a precipitation event that occurred less than 5 minutes prior to the use of a functional step to render it suddenly, and without warning, unnecessarily dangerous and unsafe to use. Otherwise, a rail carrier would be required to hire a 24/7 locomotive attendant to be available to wipe dry any exterior step or exterior walkway at any moment that precipitation should fall. "No reasonable jury could conclude that carriers have an absolute, ongoing duty to keep a locomotive's exterior walkways entirely free of precipitation-caused slipping hazards at all times - - naturally-occurring weather simply does not allow for this degree of responsiveness." *Ratcliff*, *supra* at *8.

Virtually all of the cases on which Plaintiff relies are distinguishable because they involved the accumulation of snow or ice over time, which would constitute improper maintenance, and/or prior knowledge of a non-compliant condition. *See id.* (evidence that snow and ice were present for an unknown period of time before crew's arrival, and lack of evidence about the steps defendant took to address accumulation, precluded summary judgment because a jury could find for either party); *Calabritto v. New York, New Haven and Hartford R.R.*, 287 F.2d 394 (2nd Cir. 1961) (jury verdict affirmed where employee slipped on sand on platform, where witness testified he saw sand during routine check prior to accident); *Whelan*, 503 F.2d at 889 (inspection report prior to accident described defect in step that included loose metal strip, and step assembly that "had been coated with ice for several hours prior to the accident."); *Wagner v. Union Pac. R. Co.*, 642 N.W.2d 821, 830-831 (Ct. App. Neb. 2002) (evidence indicated that all locomotives were snowy and icy, having "quite a bit of snow on their walkways and steps" with 1 to 6 inches of snow plus 3-4 inches of ice).

The *Chapman* case is one of the lone cases involving the general duties of maintenance and repair under §§ 229.45 and 229.7 that does not involve a deteriorating condition over time. In that case, Judge Barrett recently found liability when an engineer slipped on an interior step that was unexpectedly dark due to a burned out lightbulb. *Chapman* held that the defendant's duty to keep the locomotive "in a proper condition and safe to operate" meant that it could be held liable for plaintiff's injuries even if the light bulb had burned out randomly and without warning. The court reasoned that "predictability is not the standard. Rather, a rail carrier's duty under the statute is absolute

and continuous." *Chapman v. Norfolk So. Ry. Co,* 2020 WL 1676915, at *6 (additional citation omitted).

The undersigned respectfully disagrees with *Chapman*'s suggestion that a rail carrier will be liable under the LIA and the referenced regulations from the very moment that <u>any</u> part of a locomotive ceases to be "in a proper condition."   The fact that a rail carrier's *duty to comply* with the statute and its regulations is "absolute and continuous" does not mean that the text of *every regulation* imposes an "absolute and continuous" duty.  That may well be the import of some safety regulations such as the Coupler Act,[9] but that is not always the case. Controlling Sixth Circuit case law teaches that regulatory language must be reviewed carefully and in context to ensure that the rail carrier actually has violated it before finding negligence per se.  *See Edwards v. CSX Transp. Inc.*, 821 F.3d at 762 (holding that defendant did not violate regulation that bathrooms "shall be sanitary" because other regulations contemplated temporary periods of unsanitary conditions); *see also, generally*, *Miller v. Union Pacific R. Co.*, 972 F.3d at 985-86 (railroad required to inspect switch monthly was not liable when a third party was alleged to have tampered with switch after monthly inspection); *Gregory v. Missouri Pacific R. Co.*, 32 F.3d 160 (5th Cir. 1994) (regulation is violated only if a hazard is created, not by "the mere presence" of any substance including rainwater).

### ii.  Cab Floors and Passageways

That brings the Court to the third regulation on which Plaintiff relies, 49 C.F.R. §229.119(c).   Unlike the more general provisions §§ 229.45 and 229.7, § 229.119 specifically governs "Cabs, Floors, and Passageways." Each subparagraph is devoted to

---

[9]*See, e.g., O'Donnell v. Elgin, J. & E. Ry. Co.*, 338 U.S. 384, 389 (1949) (holding that the then-operative language of the coupler provision was violated when a coupler broke during an emergency stop.)

different components of a cab.  Subparagraph (c), on which Plaintiff relies, has remained

unchanged since at least 1980:

> Floors of cabs, passageways, and compartments shall be kept free from oil,
> water, waste or any obstruction that creates a slipping, tripping or fire
> hazard. Floors shall be properly treated to provide secure footing.

*Id.*, 49 C.F.R. § 229.119(c).

Plaintiff argues that § 229.119(c) imposes a continuing duty to keep exterior

"passageways" free from "water" or snow.  However, the undersigned concludes that

subparagraph (c) governs only for the <u>interior</u> flooring of the cab or of the compartments

and passageways of a locomotive.  In this respect, I respectfully part ways with *Ratcliff*

and the unpublished case on which *Ratcliff* relied, *Brall v. Norfolk So. R. Co.*, 2018 WL

2144612 (W.D. Va. May 8, 2018).

As explained below, the undersigned finds *Brall* to be unpersuasive and instead is

persuaded – notwithstanding my previously noted disagreement with its "in use" analysis

- that *Coleman*'s succinct analysis of § 229.119(c) is spot on:

> This regulation pertains [to] "cabs, passageways and compartments", all
> areas which are located in interior areas of the locomotive. There is
> absolutely no mention of exterior walkways in this regulation. Moreover,
> there is no mention in this regulation of any requirement that the railroad
> keep locomotive exterior walkways (which do not have a roof and are open
> to the elements and precipitation) completely free of naturally occurring
> precipitation such as rainwater, snow, ice or sleet.

*Id.,* 304 F.Supp.3d at 655.

*Ratcliff* accepted *Brall's* criticism of *Coleman* as overly brief and failing to cite to

other authority.  In contrast to that brevity, *Brall* provided an expansive analysis for its

view that exterior walkways fall within the scope of § 229.119(c).  *Brall* lays out three

reasons: (1) that "overwhelming support in the case law" supports its view; (2) that the

word "passageways" in § 229.119(c) is ambiguous; and (3) that the FRC's inclusion of the word "walkways" in a compliance manual means exterior walkways. However, like a house of cards, *Brall*'s reasoning collapses under close analysis.

First, *Brall* misstates the holdings of *all five cases* it cites as examples of "overwhelming support" for its expansive interpretation. *See id.* at *10. In truth, none of those cases applied §229.119(c) to an exterior walkway. The two cases involving exterior walkways cited to an *entirely different* provision, 49 C.F.R. §229.119(**e**), which specifically addresses the **exterior** "open-end platforms" of coupled cars and requires "safe passage" between connected locomotives. *See e.g., Wells v. CSX Transp. Inc.*, 2010 WL 3703711 (S.D. Ohio Sept. 17, 2010); *McClain v. Norfolk So. Ry. Co.*, 2009 WL 1812090 at *1 (N.D. Ohio June 23, 2009). The other three cases cited by *Brall* all applied § 229.119(**c**) exclusively to *interior* passageway floors or cab floors. *See, e.g.*, *Kehdi v. BNSF Ry. Co.*, Civil No. 06–6242–AA, 2007 WL 2994600, at *4 (D.Or. Oct. 11, 2007)) (uncontradicted evidence of slipping hazard including photos "showing a slick looking substance with a slip mark running through it" on the interior compressor compartment floor and a post-accident inspection report stating that the substance existed in sufficient amounts to require cleanup which violated LIA "on its face."); *McGinn v. Burlington N. R. Co.*, 848 F. Supp. 827, 830 (N.D. Ill. 1994)(regulation was not violated when plaintiff tripped over his personal belongings on the floor of the engine cab); *Riley v. Union Pacific R. Co.*, 2010 WL 1929623 at *1 (E.D. Okla. May 12, 2010) (summary judgment granted where plaintiff tripped over rusted lid to battery box on interior floor of "passageway/walkway").

A sixth case cited by *Ratcliff* is no more persuasive. In *Wagner*, 642 N.W.2d 821, the trial court cited §229.119(c) on its own initiative, without significant analysis or any briefing by the parties. The court granted summary judgment where undisputed evidence showed that the exterior platform contained a buildup of many inches of ice and snow, requiring post-accident removal with a steel bar and shovel. *Id.* at 832. The plaintiff had argued that the deteriorated condition violated the BIA's general mandate to maintain the locomotive "in proper condition and safe to operate without unnecessary peril to life and limb" as well as 49 C.F.R. § 229.7(a), and that the defendant had failed to conduct a daily inspection under 49 C.F.R. §229.21. Rather than relying upon the duties of maintenance and inspection, the trial court cited § 229.119(c) and dicta in *McGinn* (an interior floor case) in granting summary judgment. The Nebraska Court of Appeals pointed out that discrepancy,[10] and discussed cases more generally holding that "ice and snow[] can plainly render equipment unsafe to operate without unnecessary peril to life or limb and have been found to violate the BIA both directly as well as through a rail carrier's noncompliance with federal regulations promulgated under the BIA." *Id.* at 839. On appeal, the railroad did not specifically challenge the scope of §229.119(c), but instead argued only that the trial court had erred by not submitting the issue to the jury. The appellate court affirmed based upon "undisputed" evidence that "the walkway was covered with 6 inches of snow and patches of ice 4 inches thick." *See id.* at 840-841. For the reasons explained herein, *Wagner* reached the correct result but erred in citing to § 229.119(c) rather than the general duty of maintenance.[11]

---

[10]*Id.* at 840 (acknowledging that § 229.119(c) was "not one of the specific Code of Federal Regulations sections asserted" by Wagner).

[11]The same can be said of *Martin v. BNSF Ry. Co.*, 379 Mont. 423 (Mont. S. Ct. 2015), another case cited by *Ratcliff* but in which there was no discussion at all as to whether § 229.119(c) applied. In *Martin*, the

In addition to *Brall's* misstatement of the holdings of every case cited, the undersigned does not agree with *Brall* that the word "passageways" in the regulation is ambiguous. The language of §229.119(c) has remained unchanged for more than 40 years, and has always focused on "Floors" of locomotive cabs.[12] Reading the language grammatically, it specifically addresses "[f]loors of cabs, [floors of] passageways, and [floors of] compartments" that must be kept free of hazards, and directs "[f]loors" to be "properly treated to provide secure footing." *Id.* The most natural reading of the word "floor" in this context means interior flooring, not exterior steps open to the elements. Adding to this natural construction is the contextual knowledge that when the FRC has intended to address specific <u>exterior</u> components, such as connective exterior platforms between locomotives, it has done so. *See* 49 C.F.R. § 229.119(e). In fact, the scope of the FSAA covers exterior steps and grab irons of *all* railroad vehicles, including locomotives, in order to mandate the use of safety elements that decrease tripping and slipping dangers.[13] *See, e.g.*, 49 U.S.C. § 20302(a) (requiring vehicles to be equipped with "secure sill steps" and "secure ladders and running boards"); *see also generally*, 49 C.F.R. §§ 231.1 and 231.16 (requiring footboards on locomotives used in switching service to have tread surface "of antiskid design and constructed with sufficient open space to permit the elimination of snow and ice from the tread surface" and with additional specifications for steps).

---

plaintiff appealed after the trial court submitted the issue of liability to the jury, which returned a <u>defense</u> verdict. On appeal, Plaintiff argued that it was undisputed that ice and snow existed on the step. However, the Montana Supreme Court agreed that issues of fact remained as to whether ice and snow on the locomotive step *caused* the plaintiff to slip; therefore, the court affirmed.

[12]A locomotive cab consists of the interior compartment that is "occupied." See 49 C.F.R. § 229.5, defining a "cab" as "that portion of the superstructure designed to be occupied by the crew operating the locomotive." *See also id.*, defining a "[l]ocomotive cab" as "the compartment or space on board a locomotive where the control stand is located and which is normally occupied by the engineer when the locomotive is operated."

[13]Plaintiff claims no violation of any of those regulations.

Finally, the undersigned disagrees with *Brall* that the FRC compliance manual alters the natural reading of §229.119(c). Again, the regulation in grammatical structure and in its most natural reading covers only the interior floors of "cabs, passageways, and compartments." To support its expansion to exterior uncovered walkways and steps, *Brall* focused on the addition of the word "walkways" in the first sentence of the opening paragraph of the Guidance on the regulation:

> Section (c): Accumulations of oil, water, debris, and other items *on passageway* [sic], *walkways, cab control compartment floors, or engine compartment floors* should be of such a nature as to present a potential hazard and unsafe condition for any person who would use them (e.g., slipping, tripping, or does not provide secure footing). When an inspector discovers these conditions, he/she should also determine the source and take appropriate enforcement action. The regulation does not require that such things as portable ice chests or crew luggage be secured in the cab, but if these items create a personal injury hazard they should be addressed.

*See MPE Compliance Manual, https://railroads.dot.gov/sites/fra.dot.gov/files/2020-05/MPEComplianceManual2013.pdf* (emphasis added). Rather than viewing the word "walkways" as a synonym for interior walkways in context, *Brall* opined that the FRC meant to expand the reach of the regulation to uncovered surfaces.

There is no support for that hypothesis. The referenced section of the compliance manual continues on for many paragraphs to provide representative examples of what is proscribed by §229.119(c). Notably, all examples concern interior floors and passageways, with particular emphasis on different compartment floors.[14] There is not a single reference to any exterior walkways or steps. That the FRC used the term as a rough synonym for interior passageways (as did cases cited by *Brall*, *see Riley*, *supra* at

---

[14]Most of the guidance concerns the floors of air compressor compartments. Interestingly, the manual explains that the mere presence of oil on the floors of such compartments is not to be considered in violation of (c) so long as certain conditions are met.

*1), is further supported by the only other time the word "walkways" appears in the manual.  Under the interpretive Guidance provided for § 229.47, the manual speaks to the location of safety equipment on "locomotives with enclosed walkways."

To summarize: (1) there is no "overwhelming support" in the case law to expand the reach of § 229.119 to exterior walkways open to the elements; (2) the grammatical structure of the regulation is unambiguous and supports limiting its reach to interior floors; (3) there is no support for presuming that the addition of the word "walkways" in the compliance manual was intended to expand § 229.119(c) to encompass exterior steps of a locomotive.  Alternatively, if a reviewing court were to disagree and conclude that §229.119(c) applies to an exterior step fully exposed to the elements, the undersigned still would conclude that Plaintiff cannot prove a violation here. The compliance manual prohibits "[a]ccumulations" of "water…and other items…of such a nature as to present a potential hazard and unsafe condition."  Referring to a few minutes' worth of snowfall on an exterior step as a prohibited "accumulation" is beyond even the most expansive reading provided by the compliance manual.[15]

Finally, the conclusion that § 229.119(c) cannot be read to place a rail carrier in violation for failing to remove snow from an exterior step the instant it falls is supported by the same "daily inspection" regulation cited by the Sixth Circuit in *Edwards v. CSX Transp. Inc.*  In *Edwards* as here, the non-complying condition was alleged to have occurred during the plaintiff's shift, despite the fact that the bathroom there had passed

---

[15]While neither party has briefed the issue, it is not clear that the compliance manual would be entitled to full *Chevron* deference.  *See generally, Federal Exp. Corp. v. Holowecki*, 552 U.S. 389 (2008); *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  In other words, it remains an open question whether a violation of language in a manual could expand the regulatory language so that a [debatable] violation of the manual would constitute negligence per se under the FELA.

its daily inspection under 49 C.F.R. § 229.21 prior to the locomotive being put into use. The Sixth Circuit pointed out that the daily inspection requirement required only that bathrooms be inspected once per day, and that other regulations governed the timing of servicing when a non-complying condition was later discovered.

> A railroad meets the obligation of sanitary bathrooms by making daily inspections of them, just as CSX did. The regulations do not create a violation - negligence per se - any time someone finds a bathroom in an unsanitary condition, no matter the cause, no matter the time of the last inspection. The regulations require a daily inspection, 49 C.F.R. § 229.21… Otherwise, the regulations would create a 24/7 strict liability duty - one that, as the district court pointed out, would require a full-time bathroom supervisor. Nothing in the regulations suggests such a strict requirement.

*Id.*, 821 F.3d at 762 (citing 49 C.F.R. § 229.21).  The Sixth Circuit reasoned:

> We must interpret regulations, no less than other legal texts, "in a way that renders them compatible, not contradictory."…Section 229.137(c)… generally prohibits railroads from putting locomotives that have dirty bathrooms after the last daily inspection at the front of a train, but it allows this to happen in specified circumstances. ….
>
> Nor does it help [plaintiff] that a railroad's duties under the Act are "absolute and continuing" and that negligence per se liability may arise without regard to whether the railroad acted reasonably. *Lilly v. Grand Trunk W. R.R. Co.,* 317 U.S. 481, 485…. All these authorities do is take us back to the threshold question: Did CSX violate the regulations? As shown, it did not.

*Id.* (additional citations omitted).

In addition to sanitation provisions, the daily inspection regulation incorporates another regulation, 49 C.F.R. § 229.9, Movement of non-complying locomotives, that addresses servicing requirements for the use of a non-complying locomotive.

> [E]ach locomotive in use shall be inspected at least once during each calendar day. A written report of the inspection shall be made. …*Except as provided in §§ 229.9*, 229.137, and 229.139, any conditions that constitute non-compliance with any requirement of this part shall be repaired *before* the locomotive is used.

49 C.F.R.§229.21(a) (emphasis added)). When a locomotive is discovered upon its daily inspection to have a non-complying condition, 49 C.F.R. § 229.9(a) explains that it can only be "used" after being tagged as a "lite locomotive or a dead locomotive." Here, however, NS 3058 was not so tagged. Instead, it was properly put into use by Plaintiff at the beginning of his shift after he performed the daily inspection.

Plaintiff alleges that NS 3058 developed the non-complying condition (the slippery step) minutes before he used that step, hours *after* the daily inspection. 49 C.F.R. §229.9(b) explains the timing of servicing that should occur when a locomotive develops a non-complying condition after inspection:

> (b) A locomotive that develops a non-complying condition en route may continue to utilize its propelling motors, if the requirements of paragraph (a) are otherwise fully met, until the earlier of –
>
> > (1) The next calendar day inspection, or
> >
> > (2) The nearest forward point where the repairs necessary to bring it into compliance can be made.

*Id.* In other words, as with the unsanitary bathroom at issue in *Edwards*, there are some occasions in which other non-complying conditions will be briefly permitted during continued "use" of a locomotive. When § 229.119(c) is read as a whole and in context with both the statutory language and other regulations, and considering the record presented, it is clear that Plaintiff cannot prove a violation as a matter of law.

### V. Conclusion and Recommendation

For the foregoing reasons, Defendant is entitled to judgment on Plaintiff's FELA claim for the 2018 accident. Therefore, **IT IS RECOMMENDED THAT** Defendant's motion for partial summary judgment (Doc. 21) be **GRANTED**, and that Defendant's

motion to strike Plaintiff's expert's affidavit (Doc. 27) be **GRANTED in part**, with the affidavit to be preserved in the record for the benefit of any future review.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHARLES GILLIAM,                                              Case No. 1:18-cv-700

     Plaintiff,                                                    Cole, J.
                                                                       Bowman, M.J.

        v.

NORFOLK SOUTHERN RAILWAY COMPANY,

     Defendant.


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).